## City of Chicago, Plaintiff in Error, v. Pittsburg, Cincinnati, Chicago & St. Louis Railroad Company, Defendant in Error.

### Gen. No. 14,258.

1. ASSUMPSIT—*what essential to maintenance of.* The classifications of liability sustainable in assumpsit are, (a) liability upon express promises or contracts and (b) liability upon implied promises or contracts. Implied promises are divided into promises implied in fact and promises implied in law. Contracts based upon promises implied in fact arise upon circumstances being proven which, according to the ordinary course of dealing and the common understanding of men, show what is in law regarded as sufficient for a mutual intent to contract, that is, circumstances from which the intent to contract can be inferred. Contracts based upon promises implied in law are a legal fiction adopted for the purpose of enforcing legal duties by actions *ex contractu* when no contract, either express or implied, in fact exists.

2. ASSUMPSIT—*when lies by municipality against railroad to recover amount expended for repairs upon approaches to viaduct; when not.* If a city is in possession and control of streets which form approaches to a railroad viaduct and repairs the same, it may recover the amount expended in assumpsit of the railroad company

which is under obligation to keep such approaches in repair. If, however, such city has parted with its possession and control of such streets, in making such expenditures it is a mere volunteer and cannot recover of such railroad.

3. RAILROADS—*what duties of, cannot be waived by municipality.* A city cannot bind itself by a contract that it will not require a railroad company to maintain a viaduct in a street and approaches to such viaduct across the company's tracks.

4. RAILROADS—*how duty of, to construct and maintain viaducts determined.* Where the duty of a railroad company to construct viaducts and keep the same in repair is imposed by statute the statute must be looked to, to determine just what that duty is. If the statute only imposes the obligation of construction, then there is no duty to repair.

5. RAILROADS—*duty of, to construct and maintain viaducts.* Under the common law as in force in this state there is a duty and obligation imposed upon railroads to construct and maintain crossings over highways, including viaducts and approaches, when the highway existed before the railroad at the place of crossing.

6. RAILROADS—*section 20, paragraph 5, chapter 114 construed.* Held, that the above provision does not apply to railroad corporations not formed under the Railroad and Warehouse Act.

7. RAILROADS—*what determines necessity for construction and maintenance of viaducts.* The passage of an ordinance requiring the construction and maintenance of a viaduct determines the existence of a necessity for the kind and character of viaduct and approaches according to the resolution or ordinance in the particular case. The burden to establish the reasonableness of such an ordinance is not upon the city, but it is incumbent upon a railroad, if it would avoid obedience to such an ordinance, to show that it is unreasonable and invalid.

8. STREETS—*limit of power of municipality with respect to.* The authorities of cities and villages have no power even by their affirmative acts, much less by waiver or passive conduct, to surrender or grant away to railroads the public's rights in streets or highways.

9. STREETS—*when city ceases to have legal possession and control.* After park commissioners have assumed jurisdiction with respect to a particular street, the city no longer, in contemplation of law, has legal possession and control thereof.

10. PUBLIC POLICY—*how may be ascertained.* The public policy of the State may be determined by reference to its legislative enactments existing and in force, notwithstanding the same do not apply to the particular party involved in litigation before the court.

11. STATUTORY LAW—*effect given to legislative enactments.* Statutory enactments cannot be enlarged by the court in their applica-

City of Chicago v. P., C., C. & St. L. R. R. Co., 146 App. 403.

tion beyond what is expressed and what must be included by necessary implication.

12. CITIES, VILLAGES AND TOWNS—*provisions of act with reference to power of city council, etc., construed.* The provisions of article 5 of the City and Village Act constitute grants of power to the city and in nowise impose duties upon railroad companies with reference to street crossings, viaducts or approaches.

13. CITIES, VILLAGES AND TOWNS—*effect of adoption of act upon special charter of city of Chicago.* The charter powers with respect to streets conferred upon the city of Chicago by its special charter became abrogated upon the adoption by such city of the general provisions of the City and Village Act.

14. DEFINITIONS—*"highway."* Except in special instances where the context indicates otherwise, "a street" is included in the term "highway" and a sidewalk is as much a part of the highway as is the roadway for driving or the street itself.

15. VIADUCTS—*police power of municipality with respect to.* The city in the exercise of its police power may require a railroad company to repair a viaduct and the approaches thereto when the railroad was upon the ground which became the crossing before the highway existed.

16. ORDINANCES—*effect of.* An ordinance passed by a city within its legislative power has the same force and effect within its corporate limits as a law passed by the legislature.

Assumpsit. Error to the Municipal Court of Chicago; the Hon. JOHN H. HUME, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1908. Affirmed. Opinion filed January 26, 1909. Rehearing denied February 5, 1909.

Statement by the Court. On March 14, 1907, the City of Chicago brought suit in the Municipal Court against the Pittsburg, Cincinnati, Chicago and St. Louis Railroad Company and other railway companies to recover certain moneys alleged to have been paid, laid out and expended in repairing several sidewalks upon approaches to the Ogden avenue viaduct. These moneys, it is contended, were paid, laid out and expended on behalf of the railroad companies. The suit was later dismissed as to all the companies except the Pittsburg, Cincinnati, Chicago & St. Louis Railroad Company. As to this company there was a trial without a jury, finding for the defendant and, on September 23, 1907, a judgment against the plaintiff for costs.

406 APPELLATE COURTS OF ILLINOIS.

City of Chicago v. P., C., C. & St. L. R. R. Co., 146 App. 403.

To reverse that judgment the city sued out this writ of error.

There is substantially no controversy of fact. The parties might readily have had this case disposed of upon pleadings alone.

Ogden avenue runs northeast and southwest. Between Western avenue and Rockwell street, which streets run north and south, Ogden avenue is crossed, northwest and southeast, by numerous railroad tracks, converging at this point and making a very wide crossing. The railroad tracks belong to the defendant and other railroads. Coming from the northwest at right angles with Ogden avenue, Campbell avenue runs into Ogden avenue so close to the railroads as to head against some of the converging railroad tracks, which come from an easterly direction south of Ogden avenue. The travel and traffic of Campbell avenue, which stops at Ogden avenue, necessarily, as stipulated, passes to and from that street into Ogden avenue.

There is a viaduct in Ogden avenue across the railroad tracks. The approach to this viaduct on the west begins its rise a short distance west of Rockwell street and the approach on the east begins its rise a short distance west of Western avenue. When the viaduct was built, in order not to shut off the Campbell avenue traffic desiring to cross the numerous railroad tracks in either direction, a viaduct approach was built in Campbell avenue beginning its rise back some distance in Campbell avenue, northwest of Ogden avenue. The tracks appear to be much used by the railroads and the viaduct to be also much used by public travel and traffic. The sidewalks that have been repaired, for the cost of which repairs this suit was brought, are the one on the north side of the east approach on Ogden avenue and the two—both sides—on the Campbell avenue approach. The record does not show whether Campbell avenue was a public highway before there was any railroad where the crossing now is; but Ogden

avenue, it is stipulated, was a public highway at the present railroad crossing before there was any railroad there. Ogden avenue was originally a street or highway eighty feet wide, but was widened so that it became one hundred and fifty feet wide, in the manner hereinafter stated.

By an ordinance passed January 17, 1887, the City of Chicago consented that the Board of West Chicago Park Commissioners should "take, regulate, control and improve   *   *   *   the center seventy (70) feet" of a certain length, including the part herein involved, of Ogden avenue. This ordinance was passed in accordance with a legislative enactment approved June 27, 1885, and was accepted by the Park Commissioners on January 24, 1887. The legislative enactment (Session Laws 1885, p. 225) so far as material, is as follows:

"Section 1. That every board of park commissioners shall have power to connect any public park, boulevard or driveway under its control, with any part of any incorporated city, town or village, *by selecting and taking any connecting street or streets or part thereof, leading to such park."*

"Section 2. That such board of park commissioners, or such corporate authorities as are by law authorized to levy taxes or assessments for the maintenance of such parks, shall have power to improve, maintain and repair such street or streets in such manner as they may deem best; and for that purpose they are hereby authorized to pay for the improvement thereof, and from time to time to levy or cause to be levied and collected a special tax or assessment on contiguous property, abutting upon such street so improved, for a sum of money not exceeding the estimated cost of such improvement or improvements and for the further maintenance and repair thereof, as shall be ordered and estimated by such board of park commissioners."

After the passage of the ordinance of January 17, 1887, and the acceptance thereof, but before the con-

408    Appellate Courts of Illinois.

City of Chicago v. P., C., C. & St. L. R. R. Co., 146 App. 403.

struction of the viaduct, the Park Commissioners caused Ogden avenue to be widened to one hundred and fifty feet by adding thirty-five feet to each side thereof. It is agreed that the center of the original eighty foot street is the center of the present one hundred and fifty foot street and that the Ogden avenue sidewalk which was repaired is not on the original eighty feet.

In the ordinance passed by the city of Chicago it was provided that no viaduct should be constructed except with the consent of the city. During the period of time between July, 1890 and August 1, 1892, as nearly as we can ascertain from the record, the city of Chicago constructed a viaduct in Ogden avenue over this railroad crossing. The measurements given upon a plat introduced in evidence show the east approach of the viaduct on Ogden avenue to be 123.5 feet between the sidewalks, so that the sidewalk on the north side of the east approach on Odgen avenue is entirely on that part of the street or highway added by the West Chicago Park Commissioners.

It appears that before the construction of the viaduct there was some negotiation between the Commissioner of Public Works and engineers of the city and the defendant herein as to what part of the cost of the viaduct the defendant should pay. The defendant did agree to pay a portion of the cost and, in a letter to the acting City Engineer, whereby it agreed to pay a portion of such cost, it endeavored with the greatest care to limit its liability, for it says: ''this company will pay towards the construction of a viaduct on Ogden avenue, an amount equal to our share of a viaduct eighty feet wide—this amount to consist in the total cost of a superstructure *over the tracks of this company,* one-half the cost of the adjacent piers and one-half the cost of the west abutment.''

In October, 1904, the sidewalks we are concerned with had become out of repair for the first time, and on October 31, 1904, the city passed an ordinance re-

quiring the defendant and other railroad companies using the tracks under the viaduct to repair these sidewalks. The railroads were also notified to make such repairs, but they neglected and refused to do so. Then the city itself repaired these sidewalks at a cost of $3,189.18, the fairness and reasonableness of which amount is not disputed, and it has demanded from the railroads reimbursement of this amount. The amount includes the cost of repairing the sidewalks on Campbell avenue and on the north side of the east approach on Ogden avenue, inclusive, without any separation showing the cost of the Campbell avenue sidewalks separately.

CHARLES M. HAFT, GEORGE W. MILLER and EMIL C. WETTEN, for plaintiff in error; EDWARD J. BRUNDAGE, of counsel.

LOESCH, SCOFIELD & LOESCH, for defendant in error.

MR. JUSTICE CHYTRAUS delivered the opinion of the court.

The question as to the liability of the defendant railroad company in this action is considerably involved. The action is predicated upon liability in assumpsit. It is not controverted that the city has paid out and expended the sum of $3,189.18 for the repairs upon the sidewalks in question. But, on the other hand, there is no pretense that the defendant has made any express, either oral or written, request of, or promise to, the city in relation to the expenditure.

The defendant has at all times denied liability and continuously maintained a position inconsistent with any request or promise of or to the plaintiff. How, then, can the defendant be liable to the plaintiff? How can assumpsit be maintained? The classifications of liability sustainable in assumpsit are: liability upon express promises or contracts and liability upon implied promises or contracts. Here we have no express

410    APPELLATE COURTS OF ILLINOIS.

City of Chicago v. P., C., C. & St. L. R. R. Co., 146 App. 403.

promise. Implied promises are divided into promises implied in fact and promises implied in law. Contracts based upon promises implied *in fact* arise upon circumstances being proven which, according to the ordinary course of dealing and the common understanding of men, show what is in law regarded as sufficient for a mutual intent to contract — that is, circumstances from which the intent to contract can be inferred. The law in such case presumes or implies a promise in fact from the acts and conduct of the party. For instance, when one procures labor to be done for him or accepts the benefit of labor, or procures goods, wares or merchandise, or accepts such, without any express request or promise of payment therefor, under such circumstances that in equity and good conscience he ought to make payment therefor, the law will imply a promise to pay whatever the same may reasonably be worth. Such contracts are implied from the facts and circumstances, although there may be no privity between the parties. First Nat. Bank v. Gatton, 172 Ill. 625. But there can be no assumpsit based upon a promise implied *in fact* against the expressed intent of a party. Here the defendant's attitude has been such that it must be regarded as having consistently expressed its intent not to be bound and, therefore, the action does not lie upon the theory of a promise implied in fact. Contracts based upon promises implied *in law* are a legal fiction adopted for the purpose of enforcing legal duties by actions *ex contractu* when no contract, either express or implied, in fact exists. Concerning this class of contracts it is, under the head of "Contracts," in Bouvier's Law Dictionary, said: "'Contract implied in law' is, however, a term used to cover a class of obligations, where the law, though the defendant did not intend to assume an obligation, imposes an obligation upon him, notwithstanding the absence of intention on his part, and, in many cases, in spite of his actual dissent." In the case of a contract implied in law no evidence of an express promise

or of facts and circumstances—conduct—, from which an intent to promise may be inferred, is necessary, for such contract does not rest on evidence of any promise. It can, however, never exist except where there is shown a plain duty and a consideration, which consideration may consist in a parting with something by the party seeking to enforce such implied contract. Intention is not sought for or regarded. The ordinary privity of contract is here unnecessary as the privity is regarded as existing through the relative duty or obligation. The necessary promise is conclusively presumed in order that there may not be a failure of justice. In this class of assumptual obligations the duty defines and limits the contract, while in the classes of express contracts and contracts implied in fact the contract defines and limits the duty. In this class of action in assumpsit a delinquent husband is at common law bound to pay for the necessaries of his wife. And in I Chitty on Pleading, 351, in a note, in connection with this form of assumpsit, it is said: "It is clear, however, that if money be paid by a person in consequence of a legal liability to which he is subject, but from which a third person ought to have relieved him by himself paying the amount, a *request* by the party primarily in duty bound to lay out and expend the money, that it be laid out and expended, will be implied." Authorities cited, which upon inspection are found to fully sustain this rule in principle, are: Hales v. Freeman, 1 Br. & Bing. 391; Spragg v. Hammond, 2 Br. & Bing. 59; Pownal v. Ferrand, 6 Barn. & Cress. 439. Other cases in point are: Port Jarvis v. First Nat. Bank, 96 N. Y. 550; Churchill v. Holt, 127 Mass. 165; Sceva v. True, 53 N. H. 627; Hertzog v. Hertzog, 29 Pa. St. 465; Hunt v. Amidon, 4 Hill (N. Y.) 345; Jacobs v. Pollard, 10 Cush. (Mass.) 287. The cases of Village of Port Jarvis v. First Nat. Bank and Jacobs v. Pollard are interesting as exceptions to the general rule that contribution between tort-feasors will not be compelled. These contracts, implied in law,

are sometimes designated "constructive contracts." Speaking generally of the theory of implied contracts as a basis for an action in assumpsit, Prof. Walker, in Walker's American Law, sec. 179, says: "There is, perhaps no branch of the law, which the mind of an unprejudiced person will contemplate with more satisfaction than that which regulates implied contracts. The broad principle which governs them may be thus stated: Every member of society has impliedly contracted to do whatever the law requires of him."

Only, then, if we find in the case at bar a co-existent duty on the part of the plaintiff and on the part of the defendant, to make the sidewalk repairs in question, and if, as between the two, the duty rests primarily upon the defendant, will there be a liability on the part of the defendant to the plaintiff.

Consequently, it becomes necessary to inquire into the legal duties and obligations of the city and of the railroad company, relatively considered, in connection with this viaduct and the approaches thereto, and from these duties and obligations to determine whether the law raises an implied contract on the part of the railroad company to pay or refund to the plaintiff city the money it has paid out and expended.

The defendant contends for a contract, with the city, of exoneration from liability. For several reasons, however, we attach no importance to this agreement or "contract," between the city and the defendant, so strenuously contended for and much argued upon by counsel for defendant. Clearly, under Northern Pacific Railway v. Duluth, 208 U. S. 583, the city could not bind itself by a contract that it would not require the defendant railroad company to maintain a viaduct in a street, and approaches to such viaduct, across the defendant's railroad tracks. So far as can be seen from the correspondence in the record, contended to constitute the contract, neither party had in contemplation during the correspondence more than the construction of the viaduct. The repair or mainten-

ance of the viaduct or approaches was in nowise in the minds of the parties, as is plainly deducible. Waiver and surrender by a municipality of substantial rights is not to be lightly or readily inferred. No principle of the doctrine of estoppel *in pais,* upon which doctrine defendant would have to rely in this regard, sustains the defendant in its contention. The city officials, the commissioner of public works and city engineers, who acted in this matter, are not in such positions that they can, even expressly, waive and surrender the city's right and, moreover, duty to exercise its police power in the protection of the safety and welfare of its citizens. If the law imposed any duty or obligation, present or potential, upon the defendant in respect to the maintenance of the viaduct and approaches, we cannot accede to the proposition that these city officials waived or surrendered the city's right to call upon the defendant for performance, when, in the future, the occasion for performance should arise. The authorities of cities and villages do not seem to have power, even by their affirmative acts, much less by waiver or passive conduct, to surrender or grant away to railroads the public rights in streets or highways. Town of Rice v. C., B. & Q. R. Co., 30 Ill. App. 481.

It is, among other things, contended by the city to be the rule, broadly, that the duty to construct a viaduct carries with it the duty to repair it. That is the common law rule, but, in the same connection, it must not be overlooked that at common law it is the duty of the railroad company to construct a viaduct at a crossing only when the railroad is constructed over a previously existing highway. If a highway be constructed over a previously existing railroad then, according to the common law rule, there is no duty upon the railroad in respect to the maintenance of the highway. In all cases of the enactment of a statute on the subject, the statute itself must be looked to for the limitations upon the duty of the railroad. Unless

414     APPELLATE COURTS OF ILLINOIS.

City of Chicago v. P., C., C. & St. L. R. R. Co., 146 App. 403.

the statute provides for repairing and maintaining, of course, there is no statutory duty in that regard. We do not now have reference, however, to the exercise of the police power. When a statute requires merely the constructions of viaducts at crossings, by railroads, there is no principle of statutory construction that would permit courts, by mere construction, so to extend the statute as to include maintenance as a requirement. Hence the rule is not accurately stated by counsel for plaintiff in error. None of the numerous authorities cited sustains the rule as stated by counsel.

Since time immemorial, it appears, the predominant interest in a highway has been the free and unobstructed use thereof by the general public. A street is but a highway. Never has it been within the contemplation of the common law that any person or corporation should be permitted so to use the public highway or any part thereof, by crossing or otherwise, as to interfere with or destroy the free and unobstructed use thereof by the public.

Any obstruction to the traffic and travel of the general public upon the highway, through crossings by private persons or corporations, is a public nuisance at common law; and the common law is in force in this state in that respect. At common law, whenever any person or corporation for his or its own gain or advantage, convenience or necessity, interferes with, cuts into or across the highway, it devolves upon that person or corporation, at his or its own cost and expense, to restore the highway to as good condition as before. When a cut across a highway is so made as to require a bridge, it becomes obligatory upon the one making such cut not only to construct such bridge, but, also, thereafter to maintain the bridge in repair so that travel and traffic will not be unnecessarily obstructed or even inconvenienced. Dygert v. Schenck, 23 Wend. 446. The obligation is a continuing one. At common law any failure in respect thereof renders the of-

fender liable not only in civil proceedings but criminally as well. This rule, relative to interference with highways and thereby inconveniencing the public, is, on principle, the same whether the interference be completed, in its physicial extent, upon one occasion, as by the digging of a trench or cut across the highway, or the interference be by an encroachment at first insignificant which becomes seriously objectionable only by slow and gradual enlargement, as, for instance, by a railroad beginning with but one track built across a highway upon which one train a day is run and thereafter adding to the encroachment until there are a dozen tracks at the crossing and innumerable trains run daily, so as to practically appropriate the highway at the crossing. Although, in the latter case, the encroachment is of gradual and barely perceptible growth and the public authorities, therefore, are less likely to be upon guard against it, yet, when the time of action arises, the law is none the less enforcible, for the offender cannot plead laches in respect to his own wrong and against the public.

Since the appearance of railroads the common law rules relating to interference with highways have been applied to the crossings of streets and highways by them, apparently universally. There is no abatement of the common law rules in favor of railroads. The compulsory construction of viaducts may be enforced against them where, in the opinion of the proper public authorities, the convenience of the public or the safety of lives and property may so require. The common law makes no arbitrary rules, but always follows along lines of sound reasoning, and the reason for applying to a railroad the general rule and compelling it to construct a viaduct where, owing to its crossing a highway, a viaduct is required, is stated to be that the situation and the necessity in regard to the viaduct has arisen solely from the construction of the railroad. The highway was there, and the general public travel and traffic had need of no viaduct

416    APPELLATE COURTS OF ILLINOIS.

City of Chicago v. P., C., C. & St. L. R. R. Co., 146 App. 403.

but for the action of the railroad company in constructing and maintaining for its gain and advantage railway tracks over the highway.. Thus, also, is occasioned the necessity for the continuance of the viaduct in repair, so that it be safe for use. The duty of maintenance, under the common law, follows upon the duty of construction. In People v. C. & A. R. R. Co., 67 Ill. 118, our Supreme Court said: "It is a well settled principle of the common law resting upon the most obvious considerations of justice, that any person or corporation that cuts through a highway for the benefit of such person or corporation must furnish to the public a proper crossing." That case is a leading case on the subject and has frequently been cited with approval by other courts. The opinion in the case was unanimous and when it again came before the court, in 72 Ill. 83, there was no dissatisfaction expressed with the doctrine. In Bloomington v. I. C. R. R. Co., 154 Ill. 539, the case is approvingly quoted, and in C., B. & Q. Ry. v. Drainage Comm'rs., 200 U. S. 561, 589, it is also approvingly cited.

The doctrine, as stated, is well sustained by authorities. Haines v. People, 19 Ill. App. 354; Dyer County v. Railroad, 87 Tenn. 712; City v. St. P., M. & M. Ry. Co., 35 Minn. 131, 140; Eyler v. County Comm'rs., 49 Md. 268; N. C. R. R. Co. v. Baltimore, 46 Md. 425; Town v. Rutland, 75 Vt. 6; Zanesville v. Fannan, 53 Ohio, 605; Palatka etc. R. R. Co. v. State, 23 Fla. 546; Maltby v. West Mich. Ry. Co., 52 Mich. 108; Penn. Ry. Co. v. Duquesne Borough, 46 Pa. St. 223; People v. U. P. Ry. Co., 20 Col. 186; Masterson v. N. Y. etc. R. R. Co., 84 N. Y. 247; 3 Elliott on Railroads, sec. 1102. The case of Dyer County v. Railroad *supra* is of interest as it goes fully into the subject and the Supreme Court of Tennessee therein acknowledges its error in formerly holding to the contrary. In Cooke v. Boston etc. R. R. Co., 133 Mass. 185, it was held that the railroad must so keep and maintain its crossing that it will continue to meet the needs and

requirements of an increasing population in respect to safety of person and property. This is also the doctrine of Northern Pacific v. Duluth, 208 U. S. 583.

But the common law rule is different when the railroad existed upon the ground before there was any highway there. I. C. R. R. Co. v. Bloomington, 76 Ill. 447. In such case there would be no duty or obligation upon the railroad in respect to furnishing or maintaining a crossing. Here Ogden avenue existed at the place of the crossing before the railroad came, except that part made a highway by the West Chicago Park Commissioners. There is nothing in the record as to when Campbell avenue was first made a highway.

That the approaches to a viaduct, be they longer or shorter, according to the circumstances and requirements of the particular case, are a part of the viaduct, and, also, that the sidewalks upon the approaches, as well as the sidewalks upon the viaduct proper, are a part of the viaduct, are propositions, too self-evident and too plainly in accordance with the dictates of common sense to require any reference to the authorities on the subject. The common law does not permit itself to be confined or limited, on a subject such as the convenience of the public or the safety of person or property, by any such arbitrary lines as the lines of "right of way" of a railroad. At common law the duty or obligation in respect to providing for the safety of the person and property of the traveling public is not limited to the area upon the highway within the lines of its right of way. The distance between these lines may be altogether too short to make it feasible to construct a viaduct with necessary approaches, or it may be very much too long for it to be reasonable that it should all be covered with viaduct or approaches in order to sufficiently protect the public. In Bloomington v. I. C. R. R. Co., 154 Ill. 539, 547, our Supreme Court said, relating to this subject: "What would be re-

418    APPELLATE COURTS OF ILLINOIS.

City of Chicago v. P., C., C. & St. L. R. R. Co., 146 App. 403.

garded as the approaches to the crossing would largely depend upon the demands of the traveling public, upon the action of the local authorities, and upon what would be reasonable under the circumstances and local situation in each case. It is manifest that they do not and should not, in all cases, include all that part of the right of way that is covered by the street or highway." And, later: "What is to be considered as the extent of the approaches to the railroad crossing must be determined by what is reasonable in the particular case, and this is fixed, for the time being, at least, by the actual approach or structure made by the railroad company, with the acquiescence of the public and the public authorities." What is said with reference to crossing approaches is entirely applicable to viaduct approaches, and when a railroad has voluntarily contributed toward the construction of a particular viaduct that is, *prima facie* at least, evidence of its acquiescence in its extent, the same as if the railroad had itself built the viaduct.

From the foregoing it is clear that under the common law as in force in this state, there is a duty and obligation imposed upon railroads to construct and maintain crossings over highways, including viaducts and approaches, when the highway existed before the railroad at the place of crossing.

We are referred to Wetherbee v. Mich Cent. R. Co., 122 Mich. 1, by counsel for defendant, as holding that a railway company is under no obligations to repair a viaduct, or its approaches, which carries a street over its tracks. It is true that, by holding the railway not to be liable to one injured upon such a viaduct, by reason of a defect therein, the case does hold with the defendant herein in its contention. The holding in that case is upon the ground that as the city had possession and control of the viaduct therefore the railroad was not liable in a suit against it by one injured on the viaduct because of defects in the planking thereon. The case is squarely against

the decisions in this state, in the Supreme Court of the United States and all decisions elsewhere, based upon the authority of the common law. Furthermore, the decision in that case, as appears, was rendered without citation of authority or the reference to any statutory provision in support of the rule announced. We cannot follow that case as authority.

We also have in this state a legislative enactment on the subject. The railroad and warehouse act, Rev. Stats., chap. 114, sec. 20, par. 5, provides that railways may be constructed across any street or highway that their routes may intersect or touch, but they shall restore the street or highway intersected or touched "to its former state, or to such state as not unnecessarily to have impaired its usefulness, and keep such crossing in repair." In the beginning of the section it is indicated that the subject of the section is the grant of powers to railroad corporations "formed under this act," and as the record herein shows the defendant is not incorporated under that act, we cannot apply this statutory enactment to this defendant. Yet the enactment indicates that the policy of the state is neither inconsistent nor in conflict with the common law. The enactment, of course, cannot by judicial enlargement be made to embrace corporations other than those it in terms embraces.

In the same chapter we find "An Act in relation to fencing and operating railroads" in force July 1, 1874. Paragraphs 8-11 are enactments relating to the same subject. This paragraph 8 is urged upon our attention in argument. It is true it provides that the several railroads in this state shall construct and maintain all the railroad crossings of highways and streets in this state, so that these crossings shall at all times be safe as to persons and property. But this paragraph in nowise aids or assists plaintiff in error, for the duty and obligation it lays upon these railroads is expressly limited "within their respective rights of way." The record herein does not show

that any of the repairs made by the plaintiff in error, for which it now seeks to be reimbursed by the defendant in error, were made within the right of way of the defendant in error. And again we say, statutory enactments cannot be enlarged by the courts, in their application, beyond what is expressed and what must be included by necessary implication.

There is no duty imposed upon defendant by either of these two last mentioned statutory enactments, with reference to the viaduct and approaches here in question. Therefore, the plaintiff in error obtains no comfort from these enactments in the prosecution of its present claim.

The city advances various provisions of Article V of the Cities and Villages Act and various provisions of the special charter of the city as tending to sustain its contention that it is entitled to recover from the defendant railroad company the money laid out and expended for repairs of the sidewalks. The numerous provisions of Article V advanced are all in section one thereof, and they all relate to the power of the city with reference to the streets, sidewalks, railroads and crossings within the city. These provisions are all provisions granting power—provisions of empowerization—not provisions which, of and by themselves alone, create duty on the part of this defendant. Section one of Article V begins: "The city council in cities, and the president and the board of trustees in villages, shall have the following powers:" and then follow the provisions advanced by counsel. This Article V is an instrument of grant of power to the city, but in nowise does it directly impose any duty upon the defendant with reference to street crossings, viaducts or approaches.

The provisions of the special charter which are invoked are paragraphs the thirtieth, forty-ninth, fifty-fourth and the sixty-fourth of section 8, chapter IV of the charter of Chicago, passed February 13, 1863, Ses-

sion laws of 1863; also to be found in the Laws and Ordinances of Chicago of 1873.

The subjects of these special charter provisions are the same as of Article V of the Cities and Villages Act above mentioned, and we are of opinion that the charter provisions became inoperative when the City of Chicago adopted the Cities and Villages Act in 1872. But had they not become abrogated by such action of the city, what we have said with reference to the provisions of Article V would all have been applicable in respect to these charter provisions. This statutory empowerization of the city in Article V above is, however, in harmony with the common law principles regarding the duty and obligations of the defendant railroad and the city, relatively, in respect to railroad crossings within the city. Thereby is granted both legislative power and police power, and thereby the city is enabled to legislate as to the duty of railroads in the respect mentioned and to enforce both the common law and its own legislation by the exercise of the police power of the state. When the city, in conformity with these statutory enactments, has passed ordinances or resolutions it becomes the duty of the railroads, under the law, to comply with such ordinances and resolutions. The passage of an ordinance or resolution is legislation which determines the existence of a necessity for the kind and character of viaduct and approaches according to the resolution or ordinance in the particular case. If the powers of the city are exercised in respect to a locality within the jurisdiction of the city, the ordinance or resolution is valid and conclusive until overthrown in some manner and for some reason sufficient in the law. If an ordinance be resisted as invalid because unreasonable, the burden is not upon the city to show its reasonableness, but it is upon the resisting party to show that in its requirements it is unreasonable. We must assume that when this viaduct was built the existing conditions were such that

422    APPELLATE COURTS OF ILLINOIS.

City of Chicago v. P., C., C. & St. L. R. R. Co., 146 App. 403.

a viaduct and approaches of the kind and character constructed were necessary for the safety of persons and property, by reason of the conditions created in the street by the railroads. The only conclusion we can arrive at is that this viaduct and these approaches were rendered necessary and owe their existence solely to the railroad tracks that cross Ogden avenue and the trains run upon these tracks by the railroads.

Excepting special instances where the context indicates otherwise, we hold that a "street" is inlcuded in the term "highway" on the principle of M. & O. R. R. Co. v. Davis, 130 Ill. 146, and that the sidewalk is as much a part of the highway as is the roadway for driving or the street itself, upon the authority of Gridley v. Bloomington, 88 Ill. 554. The duties and obligations of the railroad and of the city, respectively, toward the public, with reference to keeping in repair the sidewalk, are of the like nature and extent as with reference to the street or roadway, so far as the general questions in this case are concerned.

As appears from decisions of our Supreme Court, presently to be cited, and from Northern Pacific v. Duluth, 208 U. S. 583, clearly expressing the law in harmony with those decisions, it is a legitimate exercise of the police power for a city to require a railway company to repair a viaduct and the approaches thereto. In that case the power was exercised with reference to a place where the railroad existed before the highway. As the case deals with the principles governing the exercise of the police power in respect to constructing and repairing viaducts and approaches and also the principles governing the bar of a contract, as contended for by this defendant, we shall refer to the case at some length. The Northern Pacific, the litigating company, set up a contract by virtue of a provision in the charter of a predecessor whose charter rights and obligations had devolved upon the Northern Pacific and a contract with the city, as exonerating it from the duty of making the re-

pairs required by the city and as restricting the exercise of the police power. The Lake Superior & Mississippi Railroad Company, the predecessor in title, had the following provision in its charter:

"Sec. 6. The said company may construct the said railroad across any public or private road, highway * * * if the same be necessary: Provided, * * * said company shall return the same to their present state, or in a sufficient manner so as not to impair the usefulness of such road, highway, stream of water or watercourse, to the owner or to the public."

"Sec. 17. This act is hereby declared to be a public act, and may be amended by any subsequent legislative assembly in any manner not destroying or impairing the vested right of said corporation."

In 1869 the Lake Superior & Mississippi Railroad laid its track, in Duluth, across the strip of land that afterwards became Lake avenue. In 1871 that avenue was laid out and has since been in continuous use as a public street. In 1901 the amount of business on Lake avenue and the number of tracks therein had become so great that the constant passage of cars and engines endangered the safety of the public. The city of Duluth then prepared plans and specifications for the construction of a viaduct in Lake avenue to carry the street over the railroad tracks and demanded that the railroad company construct the same. The company denied any obligation to build the viaduct but, after considerable negotiations, made a contract under date of September 2, 1891, which contract was set up as a full defense to the right of the city of Duluth to require the repair of the viaduct at the company's expense. The contract provided that the city should build the viaduct and carry it over the tracks and the company would contribute $50,000. The city undertook to maintain that part over the railroad's right of way for fifteen years and to perpetually maintain the approaches. The viaduct cost $23,000 in addition to the $50,000 which the company contributed. In

424    APPELLATE COURTS OF ILLINOIS.

City of Chicago v. P., C., C. & St. L. R. R. Co., 146 App. 403.

1903 the viaduct and its approaches became dangerous for public use and the city of Duluth, purporting to act within the general power conferred on it by law to require railroad companies to construct bridges and viaducts at their own expense at public railroad crossings, passed a resolution for certain repairs of the viaduct and the approaches. The resolution specified the repairs, set forth the necessity thereof, demanded that the railway company immediately proceed to make the repairs and provided that upon refusal the city attorney institute such action as he might deem proper to compel the company to make the repairs. Upon refusal by the company a *mandamus* proceeding was accordingly instituted. The Supreme Court of Minnesota affirmed a judgment awarding a *mandamus*. The case was brought to the United States Supreme Court and that court, in holding that it had jurisdiction, said: ''We are of the opinion that it [the resolution] is legislative action which impairs the obligation of the contract, if the contract is of binding force, which is a question to be determined upon the merits.'' And, later: ''If the contract was of binding force and effect it would relieve the railroad company from making such improvements within the right of way for the period of fifteen years and permanently relieve it of other improvements upon the viaduct. To require that it shall make these improvements within the period named, as this legislation does, is to require the railroad to incur expenses for things which the city has expressly contracted to relieve it from during the period mentioned.''

The question was thus squarely before the United States Supreme Court whether a city, in the exercise of its police power, can require a railroad company to repair—*i. e.*, maintain—a viaduct and the approaches thereto, when the railroad was upon the ground, which became the crossing, *before* the highway existed. And this question arose in a case where the city had expressly contracted with the railroad not

to require the repairs to be done at the expense of the railroad. By a unanimous opinion, the court held that the city could, even under these circumstances, require the railroad company to repair the viaduct and approaches thereto at its own expense. Among other things the court, in so holding, said (p. 596): "There can be no question as to the attitude of this court upon this question, as it has been uniformly held that the right to exercise the police power is a continuing one; that it cannot be contracted away, and that a requirement that a company or individual comply with reasonable police regulations without compensation is the legitimate exercise of the power and not in violation of the constitutional inhibition against the impairment of the obligation of contracts." After citing certain authorities the court further said (p. 597): "The result of these cases is to establish the doctrine of this court to be that the exercise of the police power in the interest of public health and safety is to be maintained unhampered by contracts in private interests, and that uncompensated obedience to laws passed in its exercise is not violative of property rights protected by the Federal Constitution." And, in conclusion, replying to certain contentions on the part of the railroad company, the court said: "But the exercise of the police power cannot be limited by contract for reasons of public policy, nor can it be destroyed by compromise, and it is immaterial upon what consideration the contracts rest, as it is beyond the authority of the State or the municipality to abrogate this power so necessary to the public safety."

The United States Supreme Court cites and follows C. & A. R. R. Co. v. J., L. & A. Ry. Co., 105 Ill. 388, 400. In C. & N. W. Ry. Co. v. Chicago, 140 Ill. 309, 317, it is said: "Government owes to its citizens the duty of providing and preserving safe and convenient highways. From this duty results the right of public control over public highways. Railroads are public highways, and in their re-

426    APPELLATE COURTS OF ILLINOIS.

City of Chicago v. P., C., C. & St. L. R. R. Co., 146 App. 403.

lation as such to the public are subject to legislative supervision, though the interests of their shareholders are private property." And, later, p. 319: "Railroad corporations may be required to fence their tracks, to put in cattle guards    *    *    *    and do other things for the protection of life and property, although their charters contain no such requirements." This case sustains, generally, the doctrine of the case of Northern Pacific v. Duluth. So, also, I. C. R. R. Co. v. Willenborg, 117 Ill. 203. To the same effect as to the extent of the police power is C., B. & Q. R. R. Co. v. People, 200 U. S. 561.

In Elliott on Roads, section 600, it is said: "If the railway company is bound to keep a crossing in repair and fails or refuses to perform that duty, the officers of the city or town required to see that it is kept safe for travel may repair it and recover the cost thereof from the railway."

We find nothing in People v. I. C. R. R. Co., 235 Ill. 374, denying the existence of the police power in the city with reference to railroads crossing streets or highways or curtailing its extent as laid down in the former decisions of the Supreme Court of this state or, by the Supreme Court of the United States, in Northern Pacific v. Duluth and C., B. & Q. R. R. v. Chicago. On the contrary, the existence and extent of the power is reiterated. The only question in that case was with reference to its application. It was held a railroad corporation may be required to do anything reasonably necessary for the protection and safety of persons and property crossing its railroad and that there, where the street did not pass over but under the tracks, the railroad corporation was "required to maintain its structures supporting the tracks in such condition as to render it safe for persons and property passing underneath them;" but that, in such case, the company was not required to maintain the pavement and sidewalks in the subway and approaches. In the opinion it is said that if section 8,

hereinbefore referred to, were applicable to the facts, then the city would be correct in its contention for the duty of maintenance and, later, that as the duty of maintenance was imposed on the corporation neither by its charter nor by any law passed in the exercise of the police power of the state the company's duty ended with the elevation by it of its tracks and the restoration by it of the street and sidewalks to proper condition, when the crossing was changed from one at grade to a subway; on the ground, evidently, of the absence of "any law passed in the exercise of the police power of the state" and because the company's charter only required that it "restore" the highway to its former state. It is to be observed that in that case it is stated: "At the time the Illinois Central Railroad Company was constructed, there was no Sixty-third street and no crossing at the place where it is now located;" hence the common law rule applicable when a crossing is created by the location of a highway after the railroad tracks are on the ground was applicable in that case. The common law rules as hereinbefore stated are not in conflict with anything held or said in that case.

From what has been said it is plain, that under the common law it is and has been the duty of this defendant, as well as of certain other railroad companies, to keep in repair the Ogden avenue viaduct and approaches. Whether it be more or less the duty of the defendant than the duty of some of the other roads is a question that cannot be permitted to defeat recovery in such case. When several railroads cut into a highway, or maintain an obstruction to travel thereon, at the same place, we may not be able to say that they are equally liable, but it is the act of each in conjunction with the act of each and every of the others that makes the obstruction as a whole. It is the act of each jointly with all the others that makes the viaduct and approaches necessary. This does not make the

428    APPELLATE COURTS OF ILLINOIS.

City of Chicago v. P., C., C. & St. L. R. R. Co., 146 App. 403.

railroads liable jointly only, for at common law the interference with the highway is a tort and even a crime. Joint tort-feasors are liable jointly and severally, and out of such tort as this an assumpsit grows.

On October 31, 1904, the city passed an ordinance requiring the immediate repair, by the defendant and other railroad companies, of the sidewalks here involved and other sidewalks. If the city had jurisdiction of the location, which is a question we shall presently come to, then, immediately upon the passage of the ordinance, a duty and obligation to comply therewith arose on the part of this defendant. This duty would have its source in the statutory enactments of the state. The police power of a city existing, like Chicago, under the Cities and Villages Act extends to and embraces all subjects of police regulation under the general police power of the State. McPherson v. Village, 114 Ill. 46. And, an ordinance passed by a city, within its legislative power, has the same force and effect within the corporate limits as a law passed by the legislature. Hope v. Alton, 214 Ill. 102, 105. There has been no performance by the defendant of its duty and obligation existing under the common law, nor, if the city had jurisdiction of the locality, under the legislative enactments of the state and the city.

On January 17, 1887, Ogden avenue was 80 feet wide. By an ordinance of the city passed on that day and accepted by the West Chicago Park Commissioners on January 24, 1887, the possession and control of the center 70 feet of that 80 foot street was turned over to the Park Commissioners. This transfer was made in accordance with a previous legislative enactment, approved June 27, 1885. After that transfer the city had control only over a strip five feet wide on each side of the center 70 feet of Ogden avenue. There is no sidewalk on any part of either of these five-foot strips nor has any repair been made upon either of these. The Park Commissioners increased the width

of Ogden avenue to 150 feet by adding 35 feet to each side thereof.

The duty of the city in respect to its streets and sidewalks is to keep the same reasonably safe for ordinary use, so far as this can be done by the exercise of ordinary care. Hence, the Ogden avenue viaduct and approaches being within the corporate limits of the city, we find, as a general proposition, in respect thereto, that there would be a co-existence of duty on the part of the city and on the part of the defendant to maintain the same, with the duty resting primarily upon the defendant. So far we find the conditions to exist which would permit the plaintiff herein to recover in assumpsit. But we also find that, under legislative sanction, the city divested itself of the possession and control of the greater part of Ogden avenue at the place in question, and that the part thereof upon which the repaired sidewalk rests is not now and never was in the possession or control of the city, therefore there has been no duty or obligation upon the city to keep in repair this particular sidewalk on Ogden avenue. And, hence, so far as the city laid out and expended any money for the repair of this particular sidewalk, it was a mere volunteer in the payment of another's debt or performance of his obligation and cannot recover the amount so laid out and expended upon an assumpsit implied *in law*. At the time of the expenditure of the $3,189.18, the Park Commissioners were, under the law, in absolute control of the Ogden avenue viaduct and approaches, except the two strips of five feet each. They had full power, and it was their duty, under the law, to maintain in repair that part in their possession and control. They had the power of levying taxes or special assessments for that purpose. Hence the defendant is under no obligation to reimburse the city for its expenditure upon the Ogden avenue sidewalk. The situation may be different with respect to the sidewalk on the Campbell avenue approach, but as the trial judge, under the

stipulation and evidence in this case, did not and could not, upon this record, know how much was expended for repairs to the sidewalks on Campbell avenue, the judgment rendered is correct.

The judgment of the Municipal Court of Chicago will be affirmed.

*Affirmed.*

OPINION ON PETITION FOR REHEARING.

PER CURIAM. The city petitions for a rehearing and bases its application upon three propositions:

FIRST: It is supposed the court overlooked the parties' stipulations: that Ogden avenue "was and is now a public street and highway used and occupied by the City of Chicago and the various inhabitants thereof for the purposes of public traffic and travel;" that the "viaduct, including the approaches thereto, was constructed by the City of Chicago for street cars," and that defendant entered into a contract with the city relative to the viaduct. We overlooked none of all this. It is clear that when, under and in accordance with a legislative enactment, the city, through its own ordinance and the acceptance by the Park Commissioners, parted with the right to the possession and control of the part of a highway involved, the possession and control thereof, in contemplation of law, no longer continued in the city. Thereafter the city's duty in respect thereto was not the same as in respect to other streets in the city. That surrendered highway might thereafter continue to be "used and occupied" by the city "and the various inhabitants thereof for the purposes of public traffic and travel." Such use and occupation of a highway is not in the slightest degree inconsistent with possession and control thereof by another municipality, viz.: the Park Commissioners. Possession and control of a highway by a municipality does not mean the exclusion of the traffic and travel of other municipalities and the inhabitants thereof; on the contrary, the very fact that it is

a highway implies the privileges of such traffic and travel. Occupation by one has never been considered inconsistent with possession in another. We ignored totally any question of title. For the purpose of passing upon the city's right of recovery in assumpsit (assumpsit being possibly the only theory upon which there could be a recovery by the city of the money paid out by it), it was necessary for us to ascertain if any relative duty existed *under the law* in regard to making the repairs in question. In that connection we did determine that the *possession and control* of this public highway, under the law, was in the Park Commissioners, and not in the City of Chicago, at the time these repairs were made. The municipal duty of repair followed the possession and control. There being no duty upon the city to repair, there could be no duty upon the city and the defendant railway company relatively, and, consequently, the city cannot recover in assumpsit. We fail to see how it is material who constructed the viaduct and approaches or with whom the city contracted in connection with such construction.

SECOND: It is urged that the adoption by Chicago of the Cities and Villages Act did not operate to repeal provisions of Chicago's special charter inconsistent with that act. We do not wish to be understood as holding the contrary. But the invoked provisions of the special charter are completely covered by the Cities and Villages Act and, furthermore, there is no conflict; so that the retention of those particular provisions would neither add to nor detract from the law as enacted by the Cities and Villages Act. The general subject of those particular provisions being covered by the later act, they were abrogated when the city adopted the later act.

THIRD: It is urged that a railroad is bound to maintain a crossing whether the highway existed first or not. Such is not the common law and no statute is adduced to that effect. Whence, then, can such a rule

arise? Very clearly counsel misapprehend the authorities cited by them to sustain the proposition. True, whether the highway or the railroad existed first, a railroad may be compelled to maintain crossings, by the exercise of the police power; but that is a proposition very different from that urged by counsel. When the railroad exists first it is not, in this state, so bounden either by the common law or by statute; but, although it exist first, the railroad may be compelled by the exercise of the police power to maintain a crossing, when it is reasonable that it should do so. But in such case, no duty exists until the police power is exerted, and when the state or the municipality exercises its police power, then, first, does the duty arise. As we understand the law, however, a city or other municipality cannot, by the exercise of the police power, compel the construction of a bridge or viaduct in a highway, or the repair of either, when the highway is not in the possession or control of that municipality. The petition for a rehearing is denied.